**AMERICAN CRYSTAL SUGAR CO.,**
**Plaintiff,**

v.

**The CUBAN–AMERICAN SUGAR CO.,**
**Defendant.**

United States District Court
S. D. New York.
June 6, 1957.

7. Exhibit P–3.

Cahill, Gordon, Reindel & Ohl, New York City, for plaintiff, Marshall P. Madison, San Francisco, Cal., Donald S. Graham, of Denver, Colo., Robert G. Zeller, New York City, of counsel.

Appell, Austin & Gay, New York City, for defendant, Cyrus Austin, Robert L. Loeb, New York City, of counsel.

DAWSON, District Judge.

This is an action for a permanent injunction brought by the plaintiff under § 16 of the Clayton Act, 15 U.S.C.A. § 26, in which plaintiff alleges that it is threatened with loss or damage because of the alleged violation by defendant of § 7 of the Clayton Act (15 U.S.C.A. § 18) in that defendant has acquired a substantial block of stock in the plaintiff corporation.

Plaintiff asks the Court to grant an injunction whereby defendant's officers, directors and agents, and all others acting in its behalf, will be: (a) enjoined from voting shares of stock at any meeting of plaintiff's stockholders, (b) enjoined from acquiring representation on plaintiff's board of directors, (c) enjoined from acquiring additional stock of plaintiff company and (d) required to divest themselves of plaintiff's stock in such amounts and under such terms and conditions as the Court may prescribe.

Immediately after filing the complaint, plaintiff moved for a preliminary injunction granting the same relief *pendente lite*, except for divesture. This motion was denied by Judge Cashin on the ground that the court was not convinced "of immediacy of harm to the plaintiff." D.C.S.D.N.Y.1956, 143 F. Supp. 100, 102.

Thereafter pretrial conferences were held pursuant to Rule 16 of the Federal Rules of Civil Procedure, 28 U.S.C.A. and the issues to be tried were formulated as follows:

1. Are the parties in competition with each other in any line of commerce in any section of the country? If so, to what extent and in what section are they in competition?

2. Whether the effect of the acquisition of plaintiff's shares made by the defendant has been such as to substantially lessen competition in any line of commerce in any section of the country. Whether the effect of such acquisition or any acquisition to be made in the future may be substantially to lessen competition in any line of commerce in any section of the country.

3. If the defendant's acquisition of the plaintiff's stock is in violation of the anti-trust laws, is the plaintiff threatened with loss or damage thereby?

4. Whether the defendant in purchasing the stock of the plaintiff purchased it soley for investment.

5. Whether the defendant in purchasing such stock and owning it is not using

the same by voting or otherwise to bring about or attempting to bring about a substantial lessening of competition.

A trial having been held and concluded, the Court makes the following findings of fact and conclusions of law on the issues formulated in the pretrial order.

### Issue I

Are the parties in competition with each other in any line of commerce in any section of the country? If so, to what extent and in what section are they in competition?

1. American Crystal Sugar Co. (hereinafter referred to as "Crystal") is a corporation organized and existing under the laws of the State of New Jersey, with its principal office in Denver, Colorado. Plaintiff's principal business is the manufacture of sugar from sugar beets and the sale of such sugar. Plaintiff owns and operates ten factories: four in Minnesota, two in California and one each in Montana, Colorado, Nebraska and Iowa. The beets processed in such factories are purchased from growers in surrounding areas under contracts giving the grower a percentage of the selling price of the sugar produced; the sales of such sugar are made in interstate commerce and principally in the midwestern and southeastern parts of the United States.

2. The Cuban-American Sugar Co. (hereinafter referred to as "Cuban-American") is a corporation organized and existing under the laws of the State of New Jersey, maintaining its principal office in New York, N. Y. It transacts business and is found within the Southern District of New York.

3. The defendant is a holding company and does not directly engage in the manufacture, sale or distribution of sugar. Defendant's wholly owned subsidiary, Colonial Sugars Company (hereinafter referred to as "Colonial") is a New Jersey corporation owning and operating a cane sugar refinery at Gramercy, Louisiana, which imports raw cane sugar from Cuba or obtains it from Puerto Rice, Hawaii, the Philippine Islands and the State of Louisiana; and which markets the refined sugar in interstate commerce in the midwestern and southeastern parts of the United States.

4. Both plaintiff and defendant's wholly owned subsidiary, Colonial, are engaged in interstate commerce. In addition, both Crystal and Cuban-American are listed on the New York Stock Exchange.

5. The parties stipulated in the pretrial order that: "Plaintiff and defendant's wholly owned subsidiary, Colonial Sugars Company, are to some extent in competition in a line of commerce in certain parts of the country."

6. The line of commerce in which both plaintiff and Colonial are in competition is the sale of refined sugar.

7. Plaintiff and Colonial market substantial quantities of sugar in a ten state area in the neighborhood of the Mississippi River, sometimes referred to as the "River Territory." These states are Arkansas, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Nebraska, Oklahoma and Wisconsin.

8. The average amount of sugar by hundredweight, and the average dollar value of sugar sold by Crystal and Colonial in the ten state area, during the years 1951 through 1956, and in the year 1956, and the percentage by physical volume of each to the total quantity of sugar sold in the area for the same period are approximately as follows:

|  | 1951–1956 |  |  |
|---|---|---|---|
| Plaintiff | $24,000,000 | 2,607,000 cwt. | 7.3% |
| Colonial | 19,000,000 | 2,059,000 cwt. | 5.9% |
| Total | $43,000,000 | 4,666,000 cwt. | 13.2% |
|  | 1956 |  |  |
| Plaintiff | $31,000,000 | 3,383,000 cwt. | 8.8% |
| Colonial | 18,000,000 | 1,939,000 cwt. | 5.0% |
| Total | $49,000,000 | 5,322,000 cwt. | 13.8% |

9. Crystal and Colonial in the aggregate sell more sugar than any other marketer in the River Territory except Great Western Sugar Company, a beet processor.

10. In the year 1956 Crystal and Colonial sold in the States of Illinois, Iowa and Wisconsin approximately

$26,900,000 of sugar, which constituted 13.1% of the total quantity of sugar sold in those three states in that area. Over the last six years the sales of these two companies in those three states aggregated approximately $22,700,000, which constituted about 13% of the sugar sold in those three states for that period.

11. The sales of sugar sold by Crystal and Colonial in the State of Iowa during the year 1956 aggregated approximately $4,500,000, being about 22% of the total sales of sugar sold in Iowa in that year; and in the preceding five years the aggregate sales of these two companies in the State of Iowa were approximately $4,900,000, constituting about 25% of the total sales of sugar sold in Iowa in that period.

12. Sales by Crystal and Colonial to customers in the ten state area who at any time during the period 1951 to 1955, inclusive, bought from both companies, were in the dollar amounts shown below, and such sales represented the indicated percentages of the total volume of sales of each of the two companies in the ten state area. Corresponding percentages in the States of Illinois, Iowa and Wisconsin are as follows:

| | 10-state area | | Ill. | Iowa | Wis. |
|---|---|---|---|---|---|
| | Dollar volume | % | | | |
| Crystal | $34,830,658 | 30 | 53% | 45% | 33% |
| Colonial | $34,844,264 | 37 | 45% | 70% | 29% |

13. Crystal made no sales in Arkansas until 1954, and no sales in Indiana, except a nominal amount, until 1953. Since starting to sell in those two states Crystal has been increasing its sales so that in 1955 and 1956 Crystal's sales were:

| | 1955 | 1956 |
|---|---|---|
| Arkansas | $290,513 | $379,146 |
| Indiana | $392,606 | $264,288 |

14. Colonial has been seeking to increase its customers in the ten state area over and above the present level of sales; and the testimony of C. W. Briggs, Vice President and General Sales Manager of Crystal, is that Crystal and Colonial are very competitive in the States of Iowa, Wisconsin and Illinois.[1]

15. During the past five years Crystal has increased its percentage share of the beet sugar sold in the River Territory from 13.8% to 20.4%; and plaintiff plans to increase its production of sugar in Nebraska, Colorado and Minnesota.

16. The list price of beet sugar is normally 20¢ per cwt. less than that of cane sugar, but a change in the price of one produces a prompt and corresponding change in the list price of the other. Except in rare instances industrial users buy beet and cane sugar on the basis of price.

17. As a general rule it is the beet sugar processors who are responsible for price reductions and the cane sugar refiners follow those price reductions. Sugar prices are lowest in that portion of the United States where the largest quantities of beet sugar are sold; over the years the price of cane sugar in the ten state area has been lower than in any other parts of the country, due to the large quantity of beet sugar sold in the area.

### Conclusion

18. The parties are in competition with each other in the sale of sugar in the ten state area hereinabove defined, and they constitute major competitive factors in the sale of sugar in that area.

### Issue II

Whether the effect of the acquisition of plaintiff's shares made by the defendant has been such as to substantially lessen competition in any line of commerce in any section of the country. Whether the effect of such acquisition or any ac-

---

1. "Q. Now when you say that they are very competitive in these three states what do you mean, Mr. Briggs?

A. I mean that they are making all efforts to obtain as much of the business as they can, and so are we.

The Court: Do you cut prices sometimes to get business away from each other?

The Witness: Your Honor, if necessary, we do." (R. 410)

quisition to be made in the future may be substantially to lessen competition in any line of commerce in any section of the country.

1. Plaintiff is a publicly held corporation with 364,017 shares of common stock and 58,969 shares of preferred stock issued and outstanding. Both classes of stock have equal voting rights and both are listed on the New York Stock Exchange.

2. The defendant decided in 1948 or 1949 to get into the domestic beet sugar industry by buying into one of the three largest beet sugar companies, either The Great Western Sugar Company, Holly Sugar Corporation, or Crystal.

3. In 1951 defendant proposed to the executives of the plaintiff that plaintiff and defendant consider the possibility of a closer connection between themselves by merger or otherwise. Nothing came of this proposal.

4. In 1953 defendant attempted to work out a merger or closer connection with Holly Sugar Corporation but because of the capital structure of Holly and the provisions of its bank loan agreement no such arrangement could be worked out.

5. In January 1955 defendant began to purchase plaintiff's stock. By the end of that year 10% of Crystal's common stock had been purchased by Cuban-American. From time to time authorizations were made by the board of directors of Cuban-American to its officers to purchase up to a total of 100,000 shares of Crystal stock. At the time of trial the defendant owned 97,100 shares of stock of the plaintiff; this is about 23% of the voting stock of the plaintiff.

6. The Chairman of the Board of the defendant said that his ultimate objective in the purchase of the stock was to have "a joint business venture" between the two companies which might be accomplished by merger or common control, or otherwise. He stated that when the defendant started buying the stock of plaintiff company he had in mind that this might be a step toward this closer connection between the two companies.

7. Up to date defendant has not secured a majority of the stock of the plaintiff company and although the defendant has demanded representation on the board of the plaintiff company this demand has been rejected. There has been insufficient evidence to establish that defendant's present ownership of Crystal stock has substantially lessened competition in any line of commerce in any section of the country. Whether the effect of any acquisition to be made in the future may be substantially to lessen competition in any line of commerce in any section of the country depends, of course, upon how successful the defendant will be in securing voting control of the plaintiff company, either alone or in conjunction with other parties, or in securing representation on the board of directors of the plaintiff company.

8. Defendant's avowed objective is to purchase additional shares of stock of the plaintiff company and to endeavor to bring about this "closer connection" between the two companies, either by merger, or common control, or otherwise.

9. Defendant is close to being the largest single stockholder of the plaintiff at the present time. As of May 16, 1957 defendant owned about 23% of the plaintiff's voting stock. Defendant's Chairman of the Board, his immediate family and other persons likely to accept his advice, own more than another 11,900 shares of Crystal stock. The other stock of the plaintiff is rather widely scattered: its Chairman of the Board, together with his family and organizations in which he has some interest or with which he is associated, owns approximately 22% of Crystal's voting stock, while all other directors own less than another 1%. There do not appear to be any other significant holdings.

10. Defendant is in a financial condition to continue buying additional shares of plaintiff's stock.

## Conclusion

■ 11. Since the defndant, in purchasing stock of the plaintiff, had the objective of bringing about a closer connection between the two companies, whether by merger or otherwise, and since it appears clear that the defendant continues to hold to this objective and is in a position to continue buying stock, and continues to demand representation on the board of directors of the plaintiff, the Court concludes that there is a reasonable probability that unless enjoined defendant will continue to buy stock in plaintiff company with a view to the acquisition of control of plaintiff and the eventual merger or other joint operation of plaintiff and defendant, and the effect of this joint control would be substantially to lessen competition in a line of commerce—the sale of refined sugar—in a ten state area hereinabove defined.

## Issue III

If the defendant's acquisition of plaintiff's stock is a violation of the anti-trust laws, is plaintiff threatened with loss or damage thereby?

1. A merger or common control of the plaintiff and the defendant companies would result in the lessening of competition between them and the effect would be to lessen competition in a line of commerce in a section of the country and therefore to violate the anti-trust laws.

2. It would appear clear that if defendant's acquisition of plaintiff's stock is a violation of the anti-trust laws, plaintiff would be threatened with loss or damage thereby. If the acquisition of the stock and future acquisitions of the stock resulted in a merger or joint control of the two companies, in violation of the anti-trust laws, the parties would both be subject to anti-trust actions brought by the Department of Justice. Any such actions might well result in loss and expense to the plaintiff.

3. Plaintiff is taking steps to increase the amount of business which it does in certain states in the River Territory. Disclosure of any such plans and any similar future plans to any representative of a competitor would be harmful to plaintiff; and it may be assumed that such disclosure would become inevitable if defendant succeeded in getting control of plaintiff or in obtaining representation on the board of directors of the plaintiff.

4. For over twenty years federal legislation has established a limit on the United States marketings of the domestic beet sugar industry and all other sugar suppliers in the United States. To overcome this restriction each supplier has attempted over the years to increase its quota. Similarly, a conflict has arisen between the domestic beet sugar industry and those having an interest in the Cuban sugar industry since any increase in the quota of the former must come in large part from the quota of the latter. The defendant is a member of the United States-Cuban Sugar Council which, acting in close cooperation with the Cuban government and Cuban sugar mill owners, represents the Cuban sugar viewpoint. Until recent years this Council was in sharp and active conflict with the interests of the domestic beet sugar companies with respect to amendments to the Sugar Act of 1948. If plaintiff came under control of the defendant it would tend to limit the effectiveness of the plaintiff in representing the views of the American beet sugar interests.

## Conclusion

■ 5. If the defendant's acquisition of plaintiff's stock is a violation of the anti-trust laws, plaintiff is threatened with loss or damage thereby.

## Issue IV

Whether the defendant in purchasing the stock of the plaintiff purchased it solely for investment.

1. At all times since the defendant began purchasing the stock of the plaintiff company the Chairman of the Board of the defendant company, and the principal stockholder therein, has recognized that the stock purchases were designed to facilitate a closer relationship between the two companies, either by common

control or by merger. Therefore the purpose in acquiring the stock has not been "solely" for investment but rather with the aim of bringing about this closer relationship between the two companies.

2. Except for its Crystal stock, almost all the securities owned by Cuban-American relate to its sugar subsidiaries and other affiliates. Further negating investment is the fact that plaintiff's stock enjoys a very thin market and does not possess the liquidity desirable in an ordinary investment. Defendant's purchases of plaintiff's stock between the Fall of 1954 and the institution of this suit represent a majority of this stock traded in such period on the New York Stock Exchange.

### Conclusion

3. The defendant in purchasing the stock of the plaintiff did not purchase it solely for investment.

### Issue V

Whether the defendant in purchasing the stock of the plaintiff and owning it is not using the same, by voting or otherwise, to bring about or attempting to bring about a substantial lessening of competition.

1. Beginning in May 1955, defendant has repeatedly demanded representation on the board of directors of the plaintiff. Defendant now asserts that it is entitled to such representation by virtue of its stock holdings.

2. Defendant by menas of its substantial stock holdings has succeeded in persuading officers of the plaintiff to furnish to it interim financial statements not generally made available to the public or other stockholders.

3. Defendant, at the last two annual meetings of stockholders of plaintiff, has failed to vote its shares for the election of directors on the asserted ground that it had not been consulted in connection with the make-up of the board, indicating that it expects to be consulted about the composition of the board of directors of plaintiff company. The Chairman of the board of directors of the defendant has stated to officers of the plaintiff company that when defendant increases its ownership from 100,000 to about 150,000 shares plaintiff will not have to inquire about defendant's intentions because by that time plaintiff will know those intentions; this was a statement of purpose as well as a covert threat designed to bring about an arrangement whereby the defendant would have representation on the board of directors of the plaintiff company. Any such representation would give the nominee of defendant an opportunity to be thoroughly acquainted with the business and plans of the plaintiff company and thereby to limit the effectiveness of the competition between them.

### Conclusion

4. Defendant in purchasing stock of plaintiff company and owning it, is using it to bring about or attempting to bring about a substantial lessening of competition between the companies.

### Opinion

Section 7 of the Clayton Act as originally enacted, prohibited one corporation from acquiring the stock of another corporation where the effect may be substantially to lessen the competition between them.[2] The Act was amended on December 29, 1950 to prohibit a corporation from acquiring directly or indirectly "the whole or any part of the stock" of another corporation "where in any line of commerce in any section of the country" the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly.[3]

The purpose of the amendment can be derived from the legislative history. Senate Report 1775, 81st Cong., 2d Sess. (1950), in commenting on the proposed amendment, states in part:

"The committee wished to make it clear that the bill is not intended

2. 38 Stat. 731 (1914).

3. 15 U.S.C.A. § 18.

to revert to the Sherman Act test. The intent here, as in other parts of the Clayton Act, is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." pp. 4–5; U.S.Code Cong.Service 1950, p. 4296.

No longer is elimination of competition between the companies themselves the test. The standard now is whether the effect of the acquisition of the whole or "any part" of the stock of another corporation may be substantially to lessen competition or tend to create a monopoly "in any line of commerce in any section of the country." Therefore, to determine whether this section has been violated the Court must determine (1) the line of commerce, (2) the section of the country, and (3) whether, in the light of all the competitive factors in that line of commerce in that section of the country, the particular acquisition of stock may have the effect of materially lessening competition or tending to create a monopoly. In this case the line of commerce—the sale of refined sugar—has been identified; the section of the country—the ten state area—has been defined. The remaining question is whether the effect of the acquisition of stock "may be" substantially to lessen competition in that area.

Certainly there has been no proof that defendant's acquisition of stock has so far resulted in a lessening of competition. The defendant so far has only a minority interest in the voting stock of the plaintiff company; it has been refused the privilege of naming even one director to the Board of the plaintiff. But admittedly the purchase so far of the stock is but one step in the program of the defendant. The ultimate objective of that program, as admitted by Mr. Keiser, is to bring about a merger between the corporations or a "closer association" between them.

When the statute prohibited the acquisition of not merely "the whole" but also "any part" of the stock of a competing corporation if the effect of such acquisition "may be" substantially to lessen competition, the statute obviously envisioned a situation where less than control of a competing corporation might be sufficient to be a violation of this section. This intent was expressed in the Reports of the Committees on the Judiciary which accompanied the bill when it was before Congress:

"Acquisitions of stock or assets have a cumulative effect, and control of the market sufficient to constitute a violation of the Sherman Act may be achieved not in a single acquisition but as the result of a series of acquisitions. The bill is intended to permit intervention in such a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition, even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize." H.R.Rep. No. 1191, 81st Congress, 1st Sess. 8 (1949).

"The words 'may be' have been in section 7 of the Clayton Act since 1914. The concept of reasonable probability conveyed by these words is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act. A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." S. Rep. No. 1775, 81st Cong., 2d Sess. 6 (1950), U.S.Code Cong.Service 1950, p. 4298.

We thus come to the question whether a merger or common control of these two large units in the sugar industry would, if consummated, be violative of the antitrust laws; and, if so, whether the acquisitions of stock which have so far taken place have been steps toward such restraints on competition.

The natural consequence of the profit motive in a competitive society is to lead businessmen to explore the possibilities for greater profits which might be derived from an amalgamation of competitive units, with an anticipated reduction of costs, and the establishment of a position of leadership and power in an industry which will be relatively unaffected by the competitive rivalry of smaller firms. Economists have recognized that the vigor of a competitive system exerts a centripetal force which tends, for reasons of self-interest of the parties involved, to bring about an amalgamation or union of the competitive units. Against this centripetal force the antitrust laws have interposed a centrifugal force designed to keep the units separate and distinct and to halt the tendency toward amalgamation and union which otherwise might exist, and which, if allowed to run an unrestrained course, might result in a cartelized industrial organization which would be destructive to that individual enterprise which is regarded by most Americans as a touchstone of progress.[4]

The 1950 amendments to Section 7 of the Clayton Act permit the courts to forestall such activities *in limine* rather than waiting until events proceed to such a point that there has been actual violation of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. It is because the Act was designed to reach an "incipient restraint" that it may be invoked when one company acquires "any part" of the stock of another company where the effect of such acquisition "may be" substantially to lessen competition.

A determination as to whether the merger of one company with another would result in substantially lessening competition in a particular section necessitates a consideration not merely of the competition between the two companies, but also the competitive situation of the industry.

Production, refining and distribution are the three coordinated operations involved in the complete marketing of sugar. There are two important sources of raw sugar: one is sugar cane, the other is sugar beets. While some sugar cane is grown in the South, by far the largest amount refined in the United States is imported from producing areas outside the continental United States. Foremost is Cuba, with other contributors being Puerto Rico, Hawaii and the Phillipine Islands.[5] Sugar beets, on the other hand, are produced in the West and Far West.

Refining is the operation by which raw sugar is transformed into its familiar consumable form. While the manufacture of sugar can conveniently be broken down into two steps, sugar distribution is a more complicated process. Refiners themselves do not sell directly. Instead they sell through sugar brokers as agents.

While many levels of activity in the sugar industry can be identified, the conduct of sugar refiners in selling their product is here of prime relevance. To a large extent, the history of the refining industry over the last fifty years is reflected in litigation under the anti-trust laws.[6] Throughout this period there

4. Compare the formulation enunciated by Judge L. Hand:
"Throughout the history of these statutes [the anti-trust laws] it has been constantly assumed that one of their purposes was to perpetuate and preserve, for its own sake and in spite of possible cost, an organization of industry in small units which can effectively compete with each other." United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 429.
5. 1956 U.S.Code Cong. & Adm.News, p. 2594.

6. United States v. E. C. Knight Co., 1895, 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325; United States v. Kissel, 1910, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; United States v. American Sugar Refining Co. (1922), cited in Commerce Clearing House, Federal Anti-Trust Law & Cases, 1890–1951, p. 85 (1952); United States v. New York Coffee & Sugar Exchange, 1924, 263 U.S. 611, 44 S.Ct. 225, 68 L.Ed. 475; Utah-Idaho Sugar Co. v. F. T. C., 8 Cir., 1927, 22 F.2d 122; United States v. Great Western Sugar Co., D.C.D.Neb.1929, 39 F.2d 149; Sugar

have been strong pressures prompting attempts at stabilizing the price of refined sugar. At first the dominant units in the industry attempted to form and maintain a private hegemony.[7] This effort eventually proved to be unsuccessful and was thereafter followed by an attempt at industry self-government.[8] Superimposing a broader solution to the problems of the whole industry, Congress initiated in 1934 a program of extensive regulation.[9] This legislation culminated in the Sugar Act of 1948 which is the basic statute controlling the whole industry.[10] In broad outline it provides that (1) for each year the Secretary of Agriculture set a limit on the amount of sugar which can be marketed; (2) this estimate of total consumption requirements is then allocated by the Secretary in accordance with statutory shares among domestic and various offshore producers; (3) the Secretary also assigns a production limit to each domestic grower and refiner; (4) an excise tax is collected from sugar refiners at the rate of approximately one-half cent for every pound marketed; (5) subsidies are paid to domestic beet and cane growers from the proceeds of this excise tax.

Reference to the actual structure of the refined sugar industry indicates that three firms are now pre-eminent.[11] The American Sugar Refining Co. (hereinafter referred to as "American"), National Sugar Refining Co. (hereinafter referred to as "National"), and California and Hawaiian Sugar Refining Corp. (hereinafter referred to as "C&H") have long been leaders in the refining industry. Among the others are Crystal and Colonial which, on a national basis, rank eighth and eleventh, respectively, and which, if combined, would be about the fourth ranking unit in the whole industry. To some extent concentration in the industry has resulted from recent acquisitions instead of internal growth. Thus, in 1950 American's purchases made it the majority stockholder in Spreckels Sugar Company, an important California beet processor which as an independent had ranked about tenth on a national basis. In 1956 National purchased Godchaux, a prominent Louisiana refinery ranking about twelfth nationally. These acquisitions can in part be understood as resulting from the industry-wide quota system which places a heavy emphasis on historic production. Acquisition of an existing competitor provides an enterprise with an opportunity for growth which is not possible through construction of new productive facilities. Also, to the extent that Congressional legislation indicates that beet interests will be given an increasing share of the national market, it is advantageous for a cane company to diversify and stabilize its position in the industry through affiliation with a beet refiner. These reasons, along with certain anticipated operating economics, explain the attempt to affiliate Crystal with Cuban-American.

If accomplished, coordination of Colonial and Crystal would be of significance in a wide area. There are several relevant arenas in which to measure the resultant effect upon competition. The largest of these is the ten state River Territory. It is here that Colonial and Crystal concentrate their principal sales efforts. The evidence establishes that this contiguous area comprises a relevant market. Geographically the Mississippi River Territory is bordered by cane refineries, including Colonial, at one end, and beet refineries, including Crystal, at the other. The demand for sugar in that

Institute v. United States, 1936, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859.

7. See the E. C. Knight, Kissel and American Sugar Refining cases cited supra.

8. Sugar Institute v. United States, supra.

9. The Jones-Costigan Act, 48 Stat. 670, 7 U.S.C.A. §§ 608, 608a, 609–611, 613, 615–617, 620.

10. 7 U.S.C.A. §§ 1100–1160, as modified and extended by the Sugar Act of 1956, 7 U.S.C.A. §§ 1100–1161.

11. For statistical data concerning industry position see Appendix.

area constitutes a natural locus of distribution for these refineries. For, to maximize profits sellers try to make heavy sales in the high return local area surrounding their plants, where freight is only a minor factor, and then dispose of the rest of their production by penetrating into more distant territories which are often the home areas of other competitors. Within this ten state territory there are other arenas of economic significance in which the effects on competition of a merger between Crystal and Colonial are of importance. The Illinois-Wisconsin-Iowa triangle is one of these markets. These markets are not mere legal abstractions but correspond to the commercial realities of the sugar industry. For the evidence establishes that the sales activity in each justifies an evaluation of the competitive factors of the merger in terms of its repercussions in these areas. Thus it is proper to take the ten state River Territory as one geographical market because the impact of freight rates on sugar prices separates this territory from adjoining areas. It is difficult for East and West Coast plants to participate in the ten state River Territory. Low cost transportation is not generally available from these locations.

On the other hand, Central Western beet as well as Gulf Coast cane refiners sell heavily in this area. The Gulf Coast cane refiners, such as Colonial, are able to penetrate into this area through the use of low cost transportation available in the form of barge and private truck shipments. Thus the ten state River Territory, being the natural selling area of Colonial and Crystal, is a proper section in which to determine the effects of a merger of these two refiners. Similar justifications exist for evaluating a merger in terms of its effects in the Illinois-Wisconsin-Iowa territory as Crystal's activity here has its greatest impact upon competition.

The evidence establishes that a union of Crystal and Colonial would produce a combination ranking second in the ten state River Territory. Great Western, the largest beet sugar refiner, would still rank first. In the three state Iowa-Wisconsin-Illinois territory a combination of Crystal and Colonial would have about the third largest share of the market.

In terms of market the relevant product is refined sugar. The evidence clearly establishes the high degree of interchangeability between beet and cane sugar. To some extent cane sugar has a higher degree of consumer acceptance. The traditionally known brands are those of the dominant cane refineries. Thus National selling under the "Jack Frost" trade-mark and American using the "Domino" brand find a high degree of consumer acceptance. Similarly, for certain cane specialties, such as brown sugar, there are no beet counterparts. However, the evidence indicates that in those areas in which a determined effort has been made to market beet sugar consumer acceptance has been forthcoming and as a result cane has been partly displaced. The contention that cane and beet are different products rests primarily upon the historic difference in list prices. Traditionally beet lists for 20¢ per cwt. under cane. This differential originated in the infancy of beet sugar when its quality failed to match that of first-rate cane. However, at the present time there is no quality difference between the two. Certainly as far as most industrial buyers are concerned cane and beet are interchangeable and are purchased on the basis of price, with no differential being accorded to one over the other.[12] The evidence did indicate, however, that cer-

---

12. Illuminating confirmation of the rivalry between cane and beet is provided by a trade publication's analysis of a reduction in sales by Godchaux, a leading cane refiner:

"* * * competition from beet sugar early in the year, resulting in abandonment of the Chicago and West market to beet sugar and more intense competition among the Gulf refiners for the remaining Southern market [reduced sales]."

Farr, Manual of Sugar Companies 1955/56, p. 72 (1957), Plaintiff's Exhibit Q-3.

tain purchasers who buy for resale to consumers would specify to the broker that they wanted quotations on either beet or cane. This testimony merely reflects that both products are often stocked side by side in the same store, so that it is natural for a grocer to replenish his supply of one or the other as it is diminished. To establish that for consumer purposes cane and beet are not interchangeable, it would be necessary to show that within a given range of prices consumers would not shift from one to the other. In summary it can be concluded that cane and beet are sufficiently interchangeable to be classified within the same market for the purposes of determining the competitive effects of a merger between a beet and cane refiner.

In determining the effect on competition of a merger, the behavior of other competitors in the industry is of prime importance. As established at trial, the three large cane companies do not engage in active price competition. Generally they sell at a price higher than that of other cane or beet refiners and lower their price generally only in response to price reductions by those other sellers. In contrast to American, National and C&H, Crystal and Colonial, like Great Western, are hard sellers, undercutting price where necessary to get desirable business. And, in fact, they sometimes find themselves rivals for the same business. To this extent the interchangeability between cane and beet is mirrored in the rivalry between Colonial and Crystal. These two companies manifest strong expansionistic tendencies and appear to lie athwart each other to the extent that Colonial has evidenced increasing tendencies to further penetrate into Crystal's local selling area.

To gauge the economic realities it is necessary to realize that Crystal and Colonial are prime forces in the price con-

scious industrial sugar market. This is an arena in which the impact of the three major companies is not as great as their relative size would warrant. To the extent that American, National and C&H concentrate their efforts on consumer sales upon which their well accepted brands return larger profits they have a commensurately smaller influence on non-consumer sales. Thus, so far as industrial sales are concerned, a significant contribution to competitive conduct is made by the independent decisions of Colonial and Crystal. While neither alone can set prices, each has an incentive to engage in aggressive price activity and frequently does. Coordination of the sales activities of these two companies would reduce this incentive without producing countervailing stimuli to engage in hard competition.

In urging that a merger of Crystal and Colonial would not raise a reasonable probability of a substantial lessening of competition, defendant asserts that competition will be increased because Crystal and Colonial combined will be better able to compete with American, National, C&H and Great Western. Thus it is contended that a boost to a competitor of the pre-eminent firms in an industry is *pro tanto* a benefit to competition. Examination of this contention reveals that the term "competition" is therein used in two different, if not in fact adverse, ways. For, to the extent that a union of Crystal and Colonial would produce a stronger entity, it is true that the new firm would be a greater rival of other sugar refiners. It does not follow, however, that competition in the industry would thereby be increased.[13] "Competition" is a descriptive term indicating the extent to which certain desirable types of market behavior occur.[14] A union of two units of economic significance fails to give rise to a presumption that competition is thereby promoted; in the abstract

13. Cf. Hamilton Watch Co. v. Benrus Watch Co., D.C.D.Conn.1953, 114 F. Supp. 307, affirmed 2 Cir., 206 F.2d 738 (Acquisition preliminary to merger of two leading producers prima facie vio-

lates § 7 even though other competitors are more prominent).

14. See Report of the Attorney General's National Committee To Study the Antitrust Laws, pp. 325–326 (1955).

such a union is inimical to independent pricing policies, price flexibility and the dispersion of market power. It is relevant to note that the legislative history of the 1950 Celler-Kefauver amendment to § 7 of the Clayton Act indicates that Congress conceived that substantial additions to concentration would be, in general, detrimental to competition.[15] Certainly to the extent that a reduction in the number of significant firms in an industry reduces the incentive to reap a short term advantage by independent action, economic analysis indicates that increased concentration is detrimental to competition. In any event, that Colonial and Crystal when merged would form a stronger competitor does not by itself thereby establish that competition in the industry would be intensified.

In forecasting the effect merger will have upon competition it is important to determine the opportunity for new firms to enter the industry. For if there is reasonable access to an industry amelioration of market structure conditions is possible. The evidence indicates that no new sugar refiners can be anticipated. In the last thirty years no new firms have entered the industry. Currently the quota system is a staunch barrier to new entry. Furthermore, there are positive signs of deterioration of market structure conditions. In recent years several refineries have been acquired by competitors. Thus the overall picture is of an industry tending toward increased concentration with no significant countervailing pressures.

This record leads to the conclusion that common control of Colonial and Crystal would not only extinguish competition between them but also lessen competition in the sale of refined sugar in a ten state section. Thus, violation of § 7 of the Clayton Act has beeen established. The purchase by the defendant of Crystal stock was undertaken, as was frankly admitted by Mr. Keiser, as a step toward bringing about the common control of the two companies; and the defendant apparently still has this objective in mind. Defendant is in a financial position to continue to purchase additional shares of the plaintiff company and is today the largest single stockholder in plaintiff company. The amount of stock which it holds in plaintiff company is an amount which in many situations would be deemed "working control" and unless restrained it may be anticipated that defendant will pursue its program until it secures actual working control of the plaintiff company. The purchase by the defendant of stock of the plaintiff company was accomplished with an illegal objective in mind. The acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of § 7 of the Clayton Act, "* * * whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce * * *." United States v. E. I. du Pont de Nemours & Co., 77 S.Ct. 872, 877.

### Conclusion

The Court directs that judgment shall be entered for the plaintiff as follows:

1. Adjudging that the defendant has violated § 7 of the Clayton Act.

2. That a permanent injunction be issued enjoining defendant from directly or indirectly voting any shares of stock of the plaintiff company which it may own or control, either directly or indirectly, at any meeting of plaintiff's stockholders, and from acquiring any direct or indirect representation on the board of directors of the plaintiff, and from acquiring additional stock of plaintiff.

So much of the complaint as seeks a decree directing the defendant to divest itself of stock of the plaintiff company which it may now own is not granted in view of the fact that issuance of the injunction as hereinabove directed consti-

15. See H.R.Rep.No.1191, 81st Cong., 1st Sess. 2–3 (1949); S.Rep.No.1775, 81st Cong., 2d Sess. 3–5 (1950).

tutes an appropriate remedy so that divesture is not necessary.[16]

Let appropriate decree be submitted on notice. So ordered.

### Appendix

The following tabulation (plaintiff's Exhibit YY) indicates rank and order of production upon a national basis in the sugar refining industry. Both parties have accepted the ranking shown, with counsel for Cuban-American expressing the view that Sucrest Sugar should not be listed independently but rather as part of the American Molasses Company which should appear close to tenth.

To the extent that assets appear as estimates they should be disregarded as the method by which such approximations were made was not established to be of sufficient reliability to merit acceptance.

Annual Production, Related Dollar Sales and Related Assets

of

Beet Sugar Producers and Cane Sugar Refiners

| Rank | Company | Type | Production 100 Lb. Bags | Related Dollar Sales | Related Assets | Fiscal Year Ended |
|---|---|---|---|---|---|---|
| 1. | American Sugar Refining Co. | Cane | 34,434,423 | $308,837,059 | $160,190,564 | 12/31/54 |
|  | Spreckels Sugar Co. | Beet | 4,701,613 | *43,207,823(2)* | *41,177,055(5)* | 54 Estimate |
|  |  |  | 39,136,036 | *352,044,882* | *201,367,619* |  |
| 2. | National Sugar Refining Co. | Cane | *15,533,140(1)* | 140,714,410 | 40,837,922 | 12/31/54 |
|  | Godchaux Sugar Reserve Plant | Cane | *3,686,667(1)* | *33,180,003(4)* | *14,000,000(7)* | 55 Estimate |
|  |  |  | *19,219,807* | *173,894,413* | *54,837,922* |  |
| 3. | Cal. & Hawaiian Sug. Ref. Corp. | Cane | *13,832,000(1)* | *124,488,000(3)* | *52,533,936(6)* | 12/31/55 |
| Plaintiff-Defendant Combined |  |  | 9,571,393 | *76,373,644* | *73,910,903* |  |
| 4. | Great Western Sugar Co. | Beet | 7,145,823 | 72,732,661 | 71,001,677 | 2/28/55 |
|  | Northern Ohio Sugar Co. | Beet | 391,637 | *3,599,144(2)* | *462,500(8)* | 54 Estimate |
|  |  |  | 7,537,460 | *76,331,805* | *71,464,177* |  |
| 5. | Savannah Sugar Refining Corp. | Cane | 7,231,520 | 66,554,204 | 14,285,883 | 12/31/54 |
| 6. | Revere Sugar Refinery | Cane | *6,280,507(1)* | *56,524,563(3)* | *23,853,366(6)* | 54 Estimate |
| 7. | Holly Sugar Corp. | Beet | 6,071,608 | 55,540,028 | 41,833,901 | 3/31/55 |
|  | Garden City Co. | Beet | 141,614 | *1,301,483(2)* | *1,240,266(5)* | 54 Estimate |
|  |  |  | 6,213,222 | *56,841,461* | *43,074,167* |  |
| 8. | American Crystal Sugar Co. | Beet | 5,841,593 | 42,805,444 | 59,745,123 | 3/31/55 |
| 9. | Amalgamated Sugar Co. | Beet | 4,649,708 | 46,739,800 | 34,396,655 | 9/30/54 |
| 10. | Utah-Idaho Sugar Co. (including Gunnison) | Beet | 4,011,688 | *36,867,413(2)* | 47,281,647 | 2/28/55 |
| 11. | Colonial Sugar Co. | Cane | 3,729,800 | *33,568,200(3)* | *14,165,780(6)* | 9/30/54 |
| 12. | Imperial Sugar Co. | Cane | *3,045,071(1)* | *27,405,639(4)* | 11,563,561 | 12/31/54 |
| 13. | South Coast Corp. | Cane | 2,482,140 | 20,822,198 | 11,354,055 | 7/31/54 |
| 14. | Sucrest Sugar Div., Am. M. Co. | Cane | *2,090,277(1)* | *18,812,493(3)* | *7,938,872(6)* | 54 Estimate |
| 15. | J. Aron & Co. | Cane | *2,090,277(1)* | *18,812,493(3)* | *7,938,872(6)* | 54 Estimate |
| 16. | Union Sugar Div., Cons. Foods | Beet | 2,006,393 | *18,438,752(2)* | 6,437,701 | 6/30/54 |
| 17. | Henderson Sugar Refinery | Cane | *1,567,707(1)* | *14,109,363(3)* | *5,954,151(6)* | 54 Estimate |
| 18. | Michigan Sugar Co., Inc. | Beet | 1,081,547 | 9,619,980 | 9,706,987 | 9/30/54 |
| 19. | Southdown Sugars, Inc. | Cane | *768,540(1)* | *6,916,860(3)* | *2,918,915(6)* | 2/28/55 |
| 20. | Monitor Sugar Div. | Beet | 378,846 | *3,481,595(2)* | *3,317,960(5)* | 54 Estimate |
| 21. | Buckeye Sugars. Inc. | Beet | 211,200 | *1,940,928(2)* | *1,849,704(5)* | 54 Estimate |
| 22. | Franklin County Sugar Co. | Beet | 194,260 | *1,785,249(2)* | *1,701,342(5)* | 54 Estimate |
| 23. | Layton Sugar Co. | Beet | 189,062 | *1,737,480(2)* | *1,655,818(5)* | 54 Estimate |
| 24. | Lake Shore Sugar Co. | Beet | 181,350 | *1,666,607(2)* | *1,588,276(5)* | 54 Estimate |
| 25. | Menominee Sugar Co. | Beet | 113,150 | *1,039,849(2)* | 641,278 | 4/30/54 |
| 26. | National Sugar Mfg. Co. | Beet | 68,780 | *632,088(2)* | 1,319,995 | 8/31/54 |

Notes

(1) Production Estimated. See related report Capacity and Production, Beet Sugar Plants and Cane Sugar Refiners for details of computation.

(2) Sales estimated by applying average realization of $9.19 per hundred pound bag of refined beet sugar. See Note 9 for details of computation of this average realization.

(3) Sales estimated by applying average realization of $9.00 per hundred pound bag of refined cane sugar. See Note 9 for details of computation of this average realization.

---

16. As to the propriety of divestiture consult Van Cise, Limitations Upon Divestiture, 19 Geo.Wash.L.Rev. 147, 151–153 (1950); Report of The Attorney General's National Committee To Study the Antitrust Laws, 353–358 (1955).

(4) Sales estimated by applying average cane sugar refiner's asset/sales ratio of 2.37. See Note 9 for details of computation of this ratio.

(5) Assets estimated by applying average sales/asset ratio of .953 for beet sugar plants. See Note 9 for details of computation of this ratio.

(6) Assets estimated by applying average sales/asset ratio of .422 for cane sugar refiners. See Note 9 for details of computation of this ratio.

(7) Sale price of $14,000,000 used as total asset valuation.

(8) Sale price of $462,500 used as total asset valuation.

(9) Complete sales, asset and production data which were published only for the following companies:

| Cane Sugar Refiners | Dollar Sales | Total Assets | Production 100 Lb. Bags |
|---|---|---|---|
| American Sugar Refining Co. | $308,837,059 | $160,190,564 | 34,434,423 |
| National Sugar Refining Co. | 140,714,410 | 40,837,922 | 15,533,140 |
| Savannah Sugar Refining Corp. | 66,554,204 | 14,285,883 | 7,231,520 |
| South Coast Corp. | 20,822,198 | 11,354,055 | 2,482,140 |
| | $536,927,871 | $226,668,424 | 59,681,223 |
| Beet Sugar Producers | | | |
| Great Western Sugar Co. | $ 72,732,661 | $ 71,001,677 | 7,145,823 |
| Amalgamated Sugar Co. | 46,739,800 | 34,396,655 | 4,649,708 |
| Holly Sugar Co. | 55,540,028 | 41,833,901 | 6,071,608 |
| American Crystal Sugar Co. | 42,805,444 | 59,745,123 | 5,841,593 |
| Michigan Sugar Co. | 9,619,980 | 9,706,987 | 1,031,547 |
| | $227,437,913 | $216,684,343 | 24,740,279 |

From the above data the following relationships were derived:

Cane Sugar

Average Realization—100 Lb. Bag $\quad \frac{\$536,927,871}{59,681,223} = \$9.00$

Asset/Sales Ratio $\quad \frac{\$536,927,871}{226,668,424} = 2.37$

Sales/Asset Ratio $\quad \frac{226,668,424}{536,927,871} = 42.2\%$

Beet Sugar

Average Realization—100 Lb. Bag $\quad \frac{\$227,437,913}{24,740,279} = \$9.19$

Asset/Sales Ratio $\quad \frac{\$227,437,913}{216,684,343} = 1.05$

Sales/Asset Ratio $\quad \frac{216,684,343}{227,437,913} = 95.3\%$