**AMERICAN CRYSTAL SUGAR COMPANY, Plaintiff-Appellee,**

v.

**The CUBAN–AMERICAN SUGAR COMPANY, Defendant-Appellant.**

No. 338, Docket 24962.

United States Court of Appeals Second Circuit.

Argued April 8, 1958.

Decided Oct. 1, 1958.

See, also, 19 F.R.D. 396.

Cyrus Austin, of Appell, Austin & Gay, New York City (Loeb, Churchill & Lawther, and Robert L. Loeb, New York City, on the brief), for defendant-appellant.

Robert G. Zeller, of Cahill, Gordon, Reindel & Ohl, New York City, and Marshall P. Madison, of Pillsbury, Madison & Sutro, San Francisco, Cal. (Donald S. Graham, of Lewis, Grant & Davis, Denver, Colo., on the brief), for plaintiff-appellee.

Before SWAN, HINCKS and MOORE, Circuit Judges.

HINCKS, Circuit Judge.

This is an action brought under § 16 of the Clayton Act, 15 U.S.C.A. § 26, charging a violation of § 7 of the Clayton Act, 15 U.S.C.A. § 18. Concededly the defendant[1] had acquired a block of stock in the plaintiff[1] corporation. By the action the plaintiff sought to enjoin it from making further acquisitions, from voting its stock and from obtaining representation on its Board of Directors, and to require it to divest itself of its present holdings. After trial, the trial judge filed a written decision in the form of an integral document containing findings of fact, conclusions of law and an opinion. 152 F.Supp. 387. He granted plaintiff a permanent injunction, but denied the request for divestiture. From this judgment and from an order denying a motion for new trial or for additional findings, the defendant has brought this appeal.

The background facts are as follows.[2] The plaintiff, American Crystal Sugar Company ("Crystal"), a processor and seller of beet sugar, was a publicly held corporation with about 423,000 shares of stock with full voting rights issued and outstanding. Crystal ranks eighth or ninth nationally in the production of refined sugar. In 1954, after several unsuccessful attempts to penetrate the beet sugar industry, the defendant, Cuban-American Sugar Company ("Cuban-American"), whose wholly owned subsidiary Colonial Sugars Company ("Colonial") refines and sells cane sugar, began to purchase Crystal stock. Colonial stands eleventh nationally in the production of refined sugar. At time of trial, Cuban-American had acquired 97,100 shares, or about 23% of Crystal's stock, and had demanded, unsuccessfully, representation on Crystal's Board of Directors. If Cuban-American should gain control of Crystal, the combination of Crystal and Colonial would rank about fourth in the whole industry.

The defendant contends that the court below wrongly interpreted § 7 of the Clayton Act. That section, designed to halt in their incipiency undue concentrations of economic power or monopoly, was amended by Congress in 1950 in two respects. Originally, the statute forbade mergers by the acquisition of stock where the effect might be substantially to lessen competition between the acquiring and the acquired corporation. 38 Stat. 731 (1914). Since any merger between competing corporations satisfied the prohibition of the statute on a literal

---

1. Throughout this opinion we shall refer to the appellant as the defendant and the appellee as the plaintiff.

2. The full decision below having been reported, we shall not attempt to include in this opinion a complete statement of the facts.

reading, the courts felt constrained to supply a judicial gloss which forbade only a substantial lessening of competition as measured in terms of the industry involved. International Shoe Co. v. Federal Trade Commission, 1930, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431; Pennsylvania Railroad Co. v. I. C. C., 3 Cir., 1933, 66 F.2d 37, affirmed by an equally divided court, 1934, 291 U.S. 651, 54 S.Ct. 559, 78 L.Ed. 1045; Temple Anthracite Coal Co. v. Federal Trade Commission, 3 Cir., 1931, 51 F.2d 656. In effect, they softened the literal statutory test of illegality. And the ineffectiveness of § 1 of the Sherman Act, 15 U.S.C.A. § 1 as thus interpreted to prevent mergers, see United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L. Ed. 1533, prompted Congress to enact the 1950 amendment. H.R.Rep. 1191, 81st Cong., 1st Sess. 10–11 (1949). See Report of the Attorney General's Committee to Study the Antitrust Laws, 115–17 (1955).

Section 7 in its present content, so far as here relevant, now forbids the acquisition of the whole or any part of the stock *or assets* of a corporation where, in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition. 15 U.S.C.A. § 18. The legislative history of the amendment makes it plain that Congress intended by § 7 to forbid mergers which were beyond the reach of the Sherman Act as judicially interpreted. Sen.Rep. 1175, 81st Cong., 2d Sess. 4–5 (1950). Thus under § 7 as amended the Sherman Act test is no longer appropriate, H.R.Rep. 1191, 81st Cong., 1st Sess. 8 (1949), and conduct may fall under the ban of amended § 7 before it has attained the stature of an unreasonable restraint of trade. See Pillsbury Mills, Inc., 50 F.T.C. 555, 569 (1953). And the ban on a substantial lessening of competition "in any line of commerce in any section of the country," requires, for determination of a violation, first, a definition of a relevant market in which a lessening of competition has probably occurred and, second, analysis of the nature and extent of the competition within that market. Consequently, the parties are agreed that an acquisition is not illegal because of its impact on competition between the corporations involved: that the proper test is one of the *qualitative* substantiality of the resulting effect on competition in the relevant market. We too agree. We hold that only an acquisition which in the long run may reasonably be expected to substantially lessen competition within a relevant market, will violate § 7 as amended.

The opinion below makes it abundantly plain that the judge understood the proper test of illegality. He stressed the necessity for "consideration not merely of the competition between the two companies, but also the competitive situation of the industry." He spoke of the conduct of sugar refiners in selling their product as "here of prime relevance" and sketched the history of successive attempts by the industry to stabilize sugar prices. He outlined the somewhat limited extent to which competition had been foreclosed by the National Sugar Act, 7 U.S.C.A. § 1100 et seq., and emphasized the still available room for competition in the sale and distribution of refined sugar. He examined the structure of the refined sugar industry and noted particularly the incentive which the legislative restrictions on production put on expansion by acquisition of existing refinery facilities as distinguished from expansion by the construction of new facilities. He recognized that refined sugar, both beet and cane, was the relevant market product.[3] He considered the competition between the cane and beet refiners and pointed to its intensity in the "price-conscious industrial sugar market" where the parties were "prime forces." He defined a ten-state area,[4] the so-called River Territory in

---

3. As to this, even the defendant agrees.

4. Arkansas, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Nebraska, Oklahoma and Wisconsin.

the middle west, in which the plaintiff and Colonial were in especially active competition and the market was subject to common economic forces. He noted the capacity and policy of Crystal, Colonial, and of the leading refiners for expansion both by acquisition and by competition. And he gave particular consideration to the impact of these and other forces in the ten-state area. These, then, were among the factors upon which the trial judge found a violation of § 7. Beyond doubt, he rightly understood the applicable law and sought to give it application.

The defendant, however, asserts that the ultimate conclusion reached is not sufficiently supported by findings: that the only findings made go no further than to support a conclusion, pertinent only under a test of *quantitative* substantiality, of lessened competition between Crystal and Colonial—a test now obsolete under § 7 as amended. But this criticism is based, at least in large part, on the defendant's contention that the only findings made in support of the ultimate conclusion of illegality were statements serially numbered under "Issue I" and "Issue II" in the "Findings of Fact, Conclusions of Law" below, 152 F.Supp. at pages 390 to 393, to the exclusion of additional, and non-contradictory, unnumbered findings appearing under the heading of "Opinion." We think, however, that this contention stems from misapprehension of the basic structure of the decision below. For that decision comprised one integral writing which included numbered "findings of fact" addressed to specified "Issues" each capped by a *subsidiary* and numbered "conclusion." None of these numbered conclusions purported to state the ultimate conclusion of illegality: that was not articulated until the last page of the section of the decision denominated "Opinion" which followed the numbered "findings" and "conclusions." 152 F.Supp. at page 400. There, after reciting and discussing many facts not included in the earlier, numbered, findings, the judge wrote: "*This record* leads to the conclusion that

the common control of Colonial and Crystal would not only extinguish competition between them but also lessen competition in the sale of refined sugar in a ten state section. Thus, violation of § 7 of the Clayton Act has been established." (Emphasis added.)

We think it altogether plain that the judge meant his ultimate holding of illegality to rest on the findings contained in all sections of his decision—the unnumbered findings in his "opinion" as well as the earlier stated numbered findings. Accordingly, we may properly test the validity of his holding on that same basis. Stone v. Farnell, 9 Cir., 239 F.2d 750, at page 755; Life Savers Corp. v. Curtiss Candy Co., 7 Cir., 182 F.2d 4, at pages 6 and 7. We doubt that this ruling is in conflict with such cases as Ohlinger v. United States, 9 Cir., 219 F.2d 310, and Federal Trade Commission v. B. F. Goodrich Company, 100 U. S.App.D.C. 58, 242 F.2d 31, at page 35. For in these cases, the written decision did not make it plain, as does the decision here, that the trial judge intended to base his holding not only on the formal, numbered, findings but also on findings included in the opinion.

The defendant claims error in the selection of the ten-state area as a proper geographic market or section of the country in which lessening of competition would probably result from common control of the two companies involved. We think, however, that the relevance of the ten-state market was, on the whole, sufficiently supported by evidence and findings. To the south of this area were located the cane refineries of Louisiana including that of Colonial: inside its northern perimeter and along its northwesterly border were the factories of beet processors, including most of the plaintiff's factories. In this area, about two-thirds of all the sugar sold was supplied by seven producers, three of whom were beet producers, viz., The Great Western Sugar Co., The Amalgamated Sugar Co., and the plaintiff, and four of whom were cane refiners, viz., California and Hawaiian Sugar Refining

Corp. (C & H), American Sugar Refinery Co. (American), and National Sugar Refining Co.[5] (National), and Colonial. By means of cheap river transportation and short railroad hauls Colonial, with its refinery in Louisiana, and the plaintiff, with its several refineries just within the northern perimeter of the ten-state area, were better situated to supply this territory than other more distant markets, and this locational advantage over refiners having more distant facilities each had sedulously developed by a program of aggressive competition in this area especially for the price-conscious industrial market for sugar.[6] In the period 1951 to 1956 plaintiff and Colonial together had sold a little over 13% of all the sugar sold in the ten-state area, the plaintiff's share of that market being somewhat greater than Colonial's; and the sales to customers in this area who bought of both the plaintiff and Colonial constituted 30% of the plaintiff's sales in this area and 37% of Colonial's. In 1956, about 50% of Colonial's total sales were made in this area and an even larger percentage of the plaintiff's sales. In the ten-state area a combination of the plaintiff and Colonial, if consummated, would rank second in volume of sales, exceeded only by The Great Western Sugar Company. The relevance of the ten-state market is not destroyed, we think, by the fact that one-third of its supply is scattered among others than the seven firms mentioned above in which two-thirds of the supply is concentrated.

■ The defendant concedes that, as the judge below found, the "line of commerce" here involved is the distribution and the sale of refined sugar, both cane and beet. And it concedes further that comparable grades of cane and beet sugar are "commodities reasonably interchangeable by consumers for the same purposes" within the "relevant market" test laid down in United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264. We agree and hold that it was not erroneous for the trial judge to find that the distribution of refined sugar, both beet and cane, constituted a single "line of commerce" within the meaning of § 7.

Having defined a relevant market and a line of commerce, the judge below, giving consideration to appropriate factors earlier referred to in this opinion, made findings bearing on the effect which a merger or a common control of the two companies involved would probably have on competition in that line in that market. He concluded that such competition would be lessened and we hold that the conclusion is sufficiently supported by the findings and underlying evidence. We will not restate here all the findings set forth below but will discuss the main lines of attack thereon made by the defendant.

■ The defendant, relying on the testimony of some brokers that customers in placing orders often specify either beet or cane, insists that the two products are not fully competitive. And in further support of this contention, it points to the finding that cane normally sells at 20¢ per cwt. higher than beet. However, substantial evidence traces the differential in part to the early history of the industry, when the higher purity of cane allowed it to command a higher rate, and, in part, to the packaging and trademarks used in the merchandising of cane sugar for the household consumer market. There was some evidence that in

---

5. These three cane refiners are the biggest producers in the country and are often referred to as the "Big Three" of the industry.

6. In its brief, defendant concedes that "[s]ugar producers, both beet and cane, try to sell as great a proportion of their allotments [under the National Sugar Act] or production as possible *in the* *favorable return area near their factories* and then ship their surplus into the Middle West." (Emphasis supplied.) The fact that "the favorable return area" is near the factories necessarily imports that producers have a stronger competitive position in markets in proximity to their factories than in more distant market areas.

certain areas the differential no longer exists: especially is that so in the industrial market. And there was evidence that a change in the price of one produces an equivalent and corresponding change in the price of the other. Sensitivity to price change, not price differential, is usually regarded as a proper element to measure cross-elasticity of demand. United States v. E. I. du Pont de Nemours & Co., supra. Although there was some evidence that soft drink manufacturers are reluctant to use beet sugar, almost all the testimony supported the trial court's finding of substantially complete functional interchangeability, under the tests laid down in the du Pont case, supra, as the defendant conceded. We conclude that in so far as there is in the market existence of separate "buyer demands" for cane and beet sugar, it betokens not an absence of competition between cane and beet but only that for the time being as to certain customers one or the other form of the product for one reason or another has forged ahead in the competitive race.

The defendant attacks the findings that "the three large cane companies do not engage in active price competition"; that "they sell at a price higher than that of other cane or beet refiners and lower their price generally only in response to price reductions by these other sellers"; that "they concentrate their efforts on consumer[7] sales"; and that "in the price-conscious industrial sugar market * * * the impact of the three major companies is not as great as their relative size would warrant." There was

ample testimony which if believed supported these findings. We cannot say that they were clearly erroneous. The only testimony to which the defendant points as contrary to these findings is far from conclusive.[8]

The defendant also attacks assertions in the opinion below, 152 F.Supp. at page 400, that "[t]he evidence indicates that no new sugar refiners can be anticipated. In the last thirty years no new firms have entered the industry." Its criticism is based on eight enumerated refineries, allegedly still surviving, which have "entered the cane sugar refining industry, or have commenced refining operations, since 1927." However, of these eight refineries, seven are alleged to have been built prior to 1939; only one is alleged to have been built subsequently (1949). Moreover, the evidence does not make it plain whether these refineries were built as additional facilities to provide for increased production or only to replace obsolete plants. And several of the owners cited appear to be new entrants into the industry only in the sense that they were new corporate entities which through a receiver or a reorganization succeeded to existing businesses. On the whole, we think the attack on these findings at most suggests that they were possibly[9] somewhat extreme and that it does not seriously disturb the conclusion that the sugar industry, due largely to the quota system under the National Sugar Act, is peculiarly inhospitable to incursions from outside entrepreneurs. Indeed, the mere fact that diligent counsel could find in the entire

---

7. In the terminology of this case, "consumer sales" are those for household consumption as distinguished from "industrial sales."

8. The defendant points to testimony of one of the plaintiff's brokers, as follows: " * * * our cane principal (C & H) is the highest price cane sugar that is sold in the territory; and any time they would reduce their price, the rest of the other sugar operators in the market would reduce their price very fast. As a matter of fact, they generally do it first, and then standard brand prices are dropped."

We think the crux of this testimony was the last sentence which in "a matter of fact" appears to modify and explain what preceded. The judge may rightly have understood the witness to mean that generally when price reductions occur it is the smaller operators who first drop the price and then C & H and the other large standard brand refiners follow suit.

9. Although we have, arguendo, accepted the data set forth in the defendant's reply brief, part of it we have been unable to verify due to lack of sufficient reference to the trial record.

country no more than eight new entrants into the industry within as long a period as thirty years perhaps adds some weight to the conclusion reached in the paragraph [10] of the opinion containing the criticized findings.

The defendant takes issue with the finding, 152 F.Supp. at page 397, that "[a]cquisition of an existing competitor provides an enterprise with opportunity for growth which is not possible through construction of new productive facilities." It contends the finding is inconsistent with the conceded construction of occasional new factories by existing beet processors. We perceive no vital inconsistency. The judge did not purport to find that by the allotment system or otherwise, beet processors are foreclosed of all growth. His finding was expressly comparative. It seems obvious that if the defendant obtained control of the plaintiff with its ten factories and its history of "past marketings" it would experience a growth which it could not readily achieve merely by building new factories. For to keep newly built factories busy the defendant would have to (1) find new business in the competitive market and (2) obtain increased allotments which, under § 205(a) of the National Sugar Act, depend upon three stated factors one of which is "past marketings." The mere construction of a new factory would not of itself forthwith increase *past* marketings.

■ We hold also that the findings below and the evidence as to threat of irreparable damage warranted the relief granted. The defendant was seeking not merely a minority investment in, but actual control of, one of the leading beet processors. Plainly it sought to control its policies. There seems to be nothing

in the record to suggest that heretofore the plaintiff's policies were misconceived and not adopted to its own best interests. In view of the underlying conflict of interest in the industry between Cuban cane interests, of which the defendant was a protagonist, and the beet interests, of which the plaintiff was an aggressive protagonist, and the competitive positions and policies of the plaintiff and Colonial as against each other, we think it not unreasonable to infer that the defendant's objective was to bring about some change in the plaintiff's conduct and policies to the advantage of the defendant at the expense of the plaintiff. Cf. Hamilton Watch Co. v. Benrus Watch Co., D.C., 114 F.Supp. 307, affirmed 2 Cir., 206 F.2d 738. It is true that the defendant's president testified that common control of the two companies would make for economies in the amount and cost of working capital and in the purchase of supplies. But this testimony was neither specific nor documented. The judge may well have concluded that in justice to its minority stockholders other than the defendant, the plaintiff under the defendant's control would not furnish working capital to Colonial at a charge less than that it now pays, and vice versa. He well may have been skeptical as to the possibility of economy in the purchase of sugar bags by combining orders for plaintiff's use in Minnesota and for Colonial's use in Louisiana. He may have failed to believe that due to the seasonal incidents of cane and beet production common control would promote economies in labor costs not available without such control.

That the threat of damage was imminent, on the facts and findings was too plain to deserve discussion.

10. "In forecasting the effect merger will have upon competition it is important to determine the opportunity for new firms to enter the industry. For if there is reasonable access to an industry amelioration of market structure conditions is possible. The evidence indicates that no new sugar refiners can be anticipated. In the last thirty years no new firms have entered the industry. Currently the quota system is a staunch barrier to new entry. Furthermore, there are positive signs of deterioration of market structure conditions. In recent years several refineries have been acquired by competitors. Thus the overall picture is of an industry tending toward increased concentration with no significant countervailing pressures."

**532**

Finally, the plaintiff objects on the ground of hearsay to the trial court's admission in evidence of fifteen letters, many written after action brought, addressed to plaintiff by brokers within the ten-state area, expressing concern over the competition offered by Colonial. We agree that the letters are lacking in the characteristics of trustworthiness and reliability which would make them admissible under the Federal Business Entry Statute, 28 U.S.C.A. § 1732. See United States v. Grayson, 2 Cir., 1948, 166 F.2d 863. But the trial judge received the letters not as proof of competition recited therein but only as evidence of the authors' state of mind. However that may be, it is clear that the finding of competition was based on other substantial and competent evidence. The error, if there was one, was harmless.

Affirmed.