UNITED STATES of America,
Plaintiff,

v.

LEVER BROTHERS COMPANY and Monsanto Chemical Company,
Defendants.

United States District Court
S. D. New York.
April 30, 1963.

See also 193 F.Supp. 254.

James J. Coyle, K. Frank Korf, Donald A. Kinkaid, Jerome S. Wagshal, Attorneys, Department of Justice, Washington, D. C., for United States of America.

Arnold, Fortas & Porter, Washington, D. C., for Lever Brothers Company. Abe Fortas, William L. McGovern, Abe Krash, Robert E. Herzstein, Melvin C. Garbow, Washington, D. C., of counsel.

Shearman & Sterling, New York City, for Monsanto Chemical Company. Charles C. Parlin, Jr., John E. Hoffman, Jr., New York City, of counsel.

DAWSON, District Judge.

This is an action for a permanent injunction brought by the plaintiff under Section 15 of the Clayton Act, 15 U.S.C. § 25, in which it was alleged, among other

things, that on May 22, 1957 defendant Lever Brothers Company (hereinafter either Lever Brothers or Lever) and defendant Monsanto Chemical Company (hereinafter Monsanto) entered into an agreement, and two agreements supplemental thereto, by which, in substance, Monsanto transferred to Lever Brothers trademarks, copyrights and patents relating to a detergent named "all" and Monsanto's inventory of "all" and the packaging therefor; and in which the plaintiff seeks a decree directing the defendant Lever Brothers to divest itself of the trademarks, patents and other assets and rights acquired by Lever under such arrangement, as well as its inventory of the "all" products.

Section 7 of the Clayton Act, as amended (15 U.S.C. § 18) provides in part that

" * * * [N]o corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

To determine whether this section has been violated the Court must determine (1) if any assets of a corporation subject to the jurisdiction of the Federal Trade Commission have been acquired by another corporation also engaged in commerce; (2) what is the line of commerce; (3) what is the section of the country, and (4) whether the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly.

The contract, as has been stated, was entered into on May 22, 1957. This action was filed on July 8, 1958. Pre-trial proceedings resulted in a number of stipulations which expedited the trial through the elimination of issues which otherwise would have consumed many days of trial. The trial took place between January 7, 1963 and January 21, 1963. The trial record totaled 1,258 pages, 20 witnesses were called and 186 exhibits were introduced. Briefs and reply briefs have been filed by the parties and the case is now ready for decision. The following are the issues to be decided:

(1) *Was There an Acquisition of an Asset?*

The contract of the defendants, dated May 22, 1957, provided for the following: (1) the trademark for the detergent "all" was transferred from the defendant Monsanto to the defendant Lever; (2) the patents relating to "all" were assigned to Lever; (3) Monsanto retained the right to sell the ingredients contained in "all" or the finished product under any other trademark; (4) Lever purchased Monsanto's inventories of the "all" finished product and packaging materials for a consideration of $3,025,000; (5) Lever agreed that for five years it would purchase the "all" finished product from Monsanto or, in the event it desired to manufacture "all" itself, Lever agreed to purchase the ingredients from Monsanto if the latter's prices were equal to or lower than those of alternative suppliers, and (6) Lever agreed to purchase additional chemical products from Monsanto for the ensuing five years at a yearly average of $16 million.

The defendant Lever Brothers urges that the acquisition here was not the acquisition of an asset. It appears clear, however, that a trademark may be a very valuable asset of a company; patents may be valuable assets of a company; certainly the finished products of "all" were assets. The Court must necessarily conclude that the contract involved the acquisition of assets by Lever Brothers from Monsanto. There is also no dispute that defendant Monsanto is engaged in interstate commerce and is subject to the jurisdiction of the Federal Trade Commission, and that Lever Brothers is engaged in commerce and is subject to the Federal Trade Commission.

(2) *What is the Relevant Line of Commerce?*

Since Section 7 of the Clayton Act relates to the effect of an acquisition "in

any line of commerce" it becomes necessary to determine in all of these cases what is the relevant line of commerce.

The Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) laid down the test to be employed in determining the relevant line of commerce. It said in part:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product iself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. * * *"

■ To constitute a proper line of commerce for the purpose of the statute, the line must include the substitutes for the immediate line which are readily interchangeable in use and for which there is a cross-elasticity of demand.

■ The Government, in this case, contends that the relevant line of commerce is "heavy duty detergents." Detergents are cleaning agents. A heavy duty detergent is that used primarily to clean the family wash. It is true, indeed, that heavy duty detergents may be a proper line of commerce. However, this in itself is a subdivision of a larger line which might be defined as "cleaning agents." There is certainly a cross-elasticity of demand between soaps, soap powders and detergents. Within this large category, however, there are what the Supreme Court has described as "submarkets." Certain cleaning products are particularly useful for one purpose and certain others for another. The variations in price, use and advertising appeal determine to a substantial extent what product will be used for what purpose.

■ A very distinct "submarket" exists in this field. It is low sudsing heavy duty detergents. Low sudsing detergents are used primarily in automatic washing machines and particularly front loading washing machines for reasons which will be described later in this opinion. Whether this submarket is the one which is applicable for a determination of the relevant market for antitrust purposes depends upon a number of factors. As the Supreme Court said in Brown Shoe Co. v. United States, supra, 370 U.S. at page 325, 82 S.Ct. at page 1524:

"* * * The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. * * *"

An examination of the facts discloses that low sudsing detergents were developed as specialty products designed to meet a particular need. The advent of the automatic washing machine created a need for a detergent which would provide a low volume of suds. The product was found after experimentation and research.

Chemically there are differences between high and low sudsing detergents. High sudsing detergents contain anionic salts that dissociate in water to form a charge and a high volume of suds when agitated. Low sudsing detergents are non-ionic and do not dissociate in water. The result is a lower volume of suds.

The differences in chemical formulation require different raw materials, production techniques and expertise. Manufacturing costs are higher for low sudsing detergents and this is reflected in higher retail prices. It is difficult accurately to assess the increase in cost to the consumer because rival manufacturers do not package their brands in boxes of comparable weight and do not agree as to the quantity of detergent to be used per wash. Generally the difference in cost is approximately 5 percent or about two cents per average wash.

Both high and low sudsing detergents are sold by retail grocery stores and

supermarket chain stores. They are placed in the same section of the store, although the low sudsing detergents are often segregated from the high sudsing detergents within the section reserved for cleaning products.

There has necessarily been direct competition between the low sudsing detergents and the high sudsing detergents which they sought to replace. Differences in price, differences in packaging, and the inertia incident to the use of a well known product have all played a part in determining what product would be used by the particular consumer. While there is a certain cross-elasticity of demand, nevertheless the facts show that low sudsing detergents which are sold at a higher price than ordinary heavy duty detergents are sold for a particular use, i. e., for washing the family wash in automatic washing machines. Thus approximately 90 percent of low sudsing detergents sold are used in cleaning the family wash and 88 percent of that total is employed in automatic washing machines.

The Court concludes that heavy duty detergents may indeed be a relevant line of commerce but an equally relevant submarket exists in low sudsing detergents.

(3) *What is the Section of the Country?*

The parties agreed that the section of the country involved in this case is the entire United States.

(4) *Whether the Acquisition of Such Assets May Substantially Lessen Competition*

■ This is the primary issue in this case. To determine this issue requires a consideration of the legal meaning of the term "substantially to lessen competition" and also a consideration of the facts, to see whether in fact competition may be substantially lessened.

The leading decision upon this point up to the present time is undoubtedly the decision of the United States Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8

L.Ed.2d 510 (1962). The Court pointed out that

" * * * [W]hile providing no definite quantitative or qualitative tests by which enforcement agencies could gauge the effects of a given merger to determine whether it may 'substantially' lessen competition or tend toward monopoly, Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry. * * * " 370 U.S. 294, at pp. 321–322, 82 S.Ct. 1502, at p. 1522.

The Court also pointed out that

" * * * Taken as a whole, the legislative history illuminates congressional concern with the protection of *competition*, not *competitors*, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition." 370 U.S. 294, at p. 320, 82 S.Ct. 1502, at p. 1521.

The Court concluded on this point:

" * * * Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in *any* line of commerce' (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." 370 U.S. 294, at p. 325, 82 S.Ct. 1502, at p. 1524.

And in a footnote at page 322 of the Supreme Court's opinion, the Court pointed out that

" * * * [B]oth the Federal Trade Commission and the courts have, in the light of Congress' expressed intent, recognized the relevance and importance of economic data that places any given merger under consideration within an industry framework almost inevitably unique in every case. Statistics reflecting the shares of the market controlled by

the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger. * * * " 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502, 1522.

█ This Court has therefore considered the particular market—its structure, history and probable future—as the setting for judging the anticompetitive effect of the merger considered by it. In this connection the Court finds the following facts:

*The Development of the Product Line*

This case involves to a limited extent a saga of the growth of American business—its development of new products, its development of new machines and its development of new techniques of marketing. The product involved, as has been said, is a subdivision of products generally known as detergents. Detergents are cleaning agents. Until approximately the time of World War II the cleaning agents customarily used were soaps. Soap is an organic compound made from animal or vegetable fats. Due to restrictions imposed by World War II it became necessary to develop a cleaning agent made from something other than fats. This led to the development of the synthetic detergent business. Synthetic detergents are chemical compounds produced from petroleum. They have the advantage over soaps of not combining with the salts found in hard water and also the volume of suds may be controlled to suit the needs of the particular product. The first synthetic detergent produced for cleaning purposes in substantial quantities was "Tide", manufactured by Procter & Gamble Company (hereinafter Procter & Gamble). It was put on the market late in 1946. It was followed by various other detergents manufactured and distributed by other companies. Detergents are divided into two categories —heavy duty and light duty. A heavy duty detergent is that used primarily to clean the family wash, while light duty detergents are used primarily to clean fine fabrics by hand.

At or prior to the time of the development of the detergent business, appliance manufacturers were experimenting with automatic washing machines, to relieve the housewife of the drudgery entailed in the previously existing methods for washing the family laundry. Prior to World War II several washing machine manufacturers, including Westinghouse Electric Company, had introduced a limited number of automatic washing machines to the public. The war, however, halted their production. Following the end of the war the business developed rapidly and the number of automatic washing machines increased at a rapid rate.[1]

1. Estimated Total of the Number of Automatic Washing Machines in Use at Year's End

| Year | Number of Automatic Washing Machines (in 1000s) | Percentage of Automatic Washing Machines Compared to All Washing Machines |
|---|---|---|
| 1948 | 2,485 | 10% |
| 1949 | 3,310 | 13 |
| 1950 | 4,815 | 17 |
| 1951 | 6,215 | 20 |
| 1952 | 7,625 | 24 |
| 1953 | 9,340 | 27 |
| 1954 | 11,245 | 31 |
| 1955 | 13,815 | 36 |
| 1956 | 16,295 | 40 |

Automatic washing machines, of course, require the use of cleaning agents. Originally soap powders were used, but with the development of the detergent industry detergents rapidly became substitutes for soap powders. It was found that all soaps produced a high volume of suds and every detergent then in use also produced a high volume of suds. Studies showed that the efficiency of an automatic washing machine was reduced with high suds. They impeded the operation of the machine and sometimes resulted in suds spewing on the floor. The latter problem was particularly acute in front loading washing machines. It became desirable to develop a type of detergent which was low sudsing for use in front loading washing machines. How this need was met will be discussed later in this opinion.

It should be pointed out that coincident with the development of the detergent business and the development of the automatic washing machine there was the development of new techniques in marketing. Previous to World War II most soaps and soap powders were sold in local or corner groceries where the proprietor or his assistants waited on the customers. Following World War II came the rapid development of supermarkets, in which the merchandise was simply placed on shelves and the customer herself removed the products from the shelves and took them to a check-out counter for purchase. In the ordinary local grocery store the proprietor was a form of salesman who assisted the customer in picking the product and whose recommendations resulted in increased sales. With the development of the supermarket merchandising people found that the customer had to be pre-sold, i. e., the customer, before she entered the store, had to be sold on the particular product to be picked by her from the shelves and purchased by her. This in turn resulted in a great increase of expenditures for advertising, both in newspapers and magazines and on television and radio, to pre-sell the customer on the product to be bought when she entered a supermarket. This meant that a manufacturer must be ready to spend vast sums on advertising if it wanted to gain an appreciable share of the market.

As has been said, the manufacturers of front loading washing machines found it desirable to get a cleaning agent which was low sudsing. Westinghouse Electric Company pioneered in this field. It was the largest manufacturer of front loading washing machines. It found that the detergents then being developed were not low sudsing and were creating problems with its washing machines. In December 1943 Westinghouse approached Monsanto, which was a large manufacturer of chemicals with a considerable research department, to see if it could develop for Westinghouse a low sudsing detergent for use in front loading automatic washing machines. Monsanto undertook to try to produce such a low sudsing detergent and did produce one, which it exhibited to Westinghouse. Westinghouse was so impressed with the product that it offered to put a sample box of the product in each automatic washing machine sold by it, if Monsanto would provide for the production and distribution of such a product. Monsanto, which had no substantial retail marketing division, thereupon arranged with some independent businessmen, in 1946, to form a company known as Detergents, Inc. to package and distribute this low sudsing detergent. It named the product "all".

Between 1947 and 1952 "all" was manufactured by Monsanto and sold to Detergents, Inc. which packaged it and distributed it to various outlets for resale to consumers.[2] Arrangements were made with several washing machine manufacturers, in addition to Westinghouse, to

2. Monsanto sold the "all" product to other companies for distribution under different trademarks. Climalene Co. distributed it under the trademark "Spin", Armour & Co. under the trademark "Triumph", and Swift & Co. under the trademark "Solar". Sales by Monsanto to these companies have continued subsequent to its transfer of the "all" trademark.

insert packages of "all" in the machines at the factory and before the machines were sold. Detergents, Inc. sought to promote the sale of "all" through the recommendations of appliance dealers. Prior to 1951 there was no attempt to sell "all" through grocery stores and supermarkets because the advertising and promotion expense entailed in such distribution would, in the opinion of the officials in charge, have been excessive. However, as the number of washing machines in use increased, the demand for the product increased. Detergents, Inc. found that it became necessary to introduce "all" to grocery stores and supermarkets in order to make it available to users of washing machines. The need for increased production and for advertising and distribution expenses required additional capital for Detergents, Inc. Monsanto, which had been providing the raw materials, found it necessary to increase the working capital of Detergents, Inc. by providing funds in return for its preferred and common stock. Even this was not sufficient to provide it with the additional capital which it needed and in January, 1953, Detergents, Inc. was dissolved as a corporate entity and became a division of Monsanto. During this period, prior to 1953, "all" was the only low sudsing synthetic detergent available to consumers. There were other synthetic detergents being sold but each was high-sudsing. Even so, the profits on the business of Detergents, Inc. had not been satisfactory.

Between 1947 and January 1953 Detergents, Inc. had the following profits and losses from the sale of "all":

| Year | Profit (Loss) |
|------|---------------|
| 1947 | $ 41,000 |
| 1948 | (55,000) |
| 1949 | (206,000) |
| 1950 | 106,000 |
| 1951 | (47,000) |
| 1952 | 118,000 |
| Total | $(43,000) |

Thus, although during the period prior to 1953 "all" was the only low sudsing synthetic detergent available to consumers, nevertheless the distribution of this product during the six years prior to 1953 by Detergents, Inc. had resulted in an over-all loss to that company. Monsanto, of course, had made certain profits on the sale of the raw material to Detergents, Inc. since it provided Monsanto with an outlet for its phosphate products.

The decision of Monsanto, in January, 1953, to both manufacture and distribute "all" represented a significant departure in its policies. At that time it sold very few products directly to the consumer. Thus in 1954 Monsanto's sale of "all" totaled approximately $34 million, while its sale of all other household consumer goods totaled only $1,450,000. When it took over the business it engaged in an active advertising and distribution campaign. It attempted to place "all" on grocers' shelves through independent food brokers who received a commission of 5 percent.[3] However, with the introduction of other low sudsing detergents, which will hereinafter be discussed, Monsanto could no longer depend upon the continued recommendation of "all" by manufacturers and distributors of automatic washing machines. Prior to 1954 Monsanto's only expense in this regard was the supplying of free samples of "all" to be packed in and given away with each new automatic washing machine. In 1955 Monsanto spent $1.5 million in cooperative advertising with manufacturers of washing machines in an unsuccessful attempt to retain their recommendations. This ran into conflict with the other producers of low sudsing detergents who had come into the market and by March, 1957, no manufacturer was placing "all" samples in its automatic washing machines.

This change in the marketing situation was occasioned by the introduction of

3. Early in 1956 the brokerage commission paid by Monsanto was reduced. The new formula was 3 percent on sales up to 75 percent of the previous year's volume, and 5 percent on all amounts above that volume.

other low sudsing products. In June, 1954, Procter & Gamble introduced a low sudsing product named "Dash" and about six months later Colgate-Palmolive Company (hereinafter Colgate) introduced a low sudsing brand named "Ad". The introduction of these two brands reflected the increase in sales of automatic washing machines and the expanding market for low sudsing detergents specifically suited for the needs of these machines. By June, 1954, approximately 11 million automatic washing machines were in use, which was five times the number of machines which had been sold in 1946 when "all" was first introduced.

With the introduction of "Dash" and "Ad" in 1954 and 1955, Monsanto was forced to increase its advertising and promotional budget. Nevertheless the sales of "all" failed to keep pace with the expanding market for low sudsing synthetic detergents. The number of automatic washing machines in use rose from 11,245,000 in 1954 to 16,295,000 in 1956. Case sales of low sudsing detergents rose from 3,486,000 cases in 1954 to 7,836,000 in 1956. Nevertheless the percentage of the market of "all" steadily declined. In 1953, when case sales of "all" totaled 2,389,000 this constituted 100 percent of the low sudsing detergent market. By 1956 case sales of "all" had increased to 4,331,000 cases, but this constituted only 55.3 percent of the market for low sudsing detergents. Monsanto's advertising and promotion expense for "all" increased from over $5 million in 1953 to a high of over $12 million in 1955. In 1956 it determined to reduce its advertising expenditures, thereby attempting to increase its profits in the short run based upon the previous advertising. It dropped its advertising to under $9 million in 1956 and found that its percentage of the market dropped from 79.2 percent to 55.3 percent.

Monsanto's profits and losses were derived from two divisions. The first division, which was the Inorganic Division, produced the raw material. The second division, which was the Consumer Products Division, manufactured, sold and distributed the finished product. The profits and losses of these two divisions in the years 1953 through 1955 were as follows:

| Year | Profits Inorganic Division as to "all" (in $1,000) | Profits (Losses) Consumer Products Division as to "all" (in $1,000) |
|---|---|---|
| 1953 | $3,509 | $(1,210) |
| 1954 | 1,866 | 538 |
| 1955 | 2,481 | (2,897) |

Thus on a company-wide basis Monsanto lost $416,000 on "all" in 1955. In March 1956 Monsanto decided that it would either sell the "all" trademark or acquire other consumer products to distribute with "all". Efforts on the part of Monsanto to develop companion products to "all" proved unsuccessful. It decided to dispose of "all".

The decision to sell the trademark "all" was based on many factors. Monsanto was a company which had long been engaged in research and manufacture of raw chemicals in bulk for distribution in final form by others.[4] The officers of the company felt that they had no expertise in the field of developing and marketing consumer products. There was dissension within the company as to whether advertising and promotion expenses should be increased to compete more successfully with the other low sudsing detergent manufacturers, or whether such funds should be used to develop other industrial products. Monsanto was then producing between four and five hundred different products whose entire advertising and promotion budget amounted to approximately $5 million. Advertising and promotion for "all" alone in 1955 was over $12 million. The average yearly expense for this advertising of one consumer product was approximately equal to the average yearly expense for re-

---

4. In 1956 Monsanto's net sales on a company-wide basis totaled $653 million, of which "all" was less than 5 percent.

search for the entire company. The decision to sell "all" was based in part on the desire to reduce internal dissension in the company about the product "all" and also an inherent distrust of an advertising and promotion expense that was equal to the company's entire research budget. Additional motivation was provided by the losses sustained by the Consumer Products Division in 1955. This was a direct result of increasing competition from "Dash" and "Ad". The decision was made to dispose of "all". This was accompanied by a concomitant reduction in advertising and promotion expenditures. It was hoped that this would allow Monsanto to capitalize on the momentum generated by past expenditures and thereby reverse the losses of the Consumer Products Division. Losses were, in fact, reduced in 1956 and a profit earned in the first five months of 1957.

It was the desire of Monsanto to get out of a business in which it could only lose money unless it invested continually larger amounts for advertising and promotion to compete with Procter & Gamble and Colgate. At the same time Monsanto desired, of course, to have an opportunity to dispose of its raw material, "Sterox," which was used in the manufacture of "all". Monsanto therefore discussed the possible transfer of the "all" merchandising business with three companies before approaching Lever Brothers. They were General Foods Co., Purex Co. and Armour & Co. Negotiations with General Foods were broken off by that company for reasons unknown to Monsanto. Purex was rejected by Monsanto as a possible purchaser because it lacked the capital effectively to advertise and promote "all". Armour & Co. was eliminated from consideration because it refused to meet prices set by Monsanto for future purchases of those raw materials.

In January, 1957, Monsanto approached Lever Brothers to inquire if it would be interested in taking over the merchandising of "all".

*The Position of Lever Brothers*

Lever Brothers is an old, established company, which has long been in the business of manufacturing soap and cleaning products. Heavy duty soap products manufactured by Lever made substantial profits in the years 1948 to 1956. It did not do as well in the detergent business. Lever Brothers introduced a heavy duty synthetic detergent named "Surf" in 1948. By the end of 1956 "Surf" succeeded in capturing only 3 percent of the market and had lost a total of over $25 million.[5] As of December 31, 1956, Lever Brothers lost over $36 million in an unsuccessful effort to market a line of heavy duty synthetic detergents. Only one of its products, "Breeze", introduced in 1952, had made appreciable profits. "Breeze" is a premium product which means that a premium, such as a towel, is packed in the box. There was, admittedly, only a limited market for such premium products.

The substantial losses in the heavy duty detergent business were not offset by the profits in the soap business. Moreover, the prospects for future profits were not bright because of the decline in sales of soap products. Profits of over $3 million in 1953, in the soap business, were reduced to $431,000 in 1956; such profits continued to decline until they were only $142,000 in 1960.

It became obvious to any company in this business that it was necessary to have a low sudsing synthetic detergent if one were to remain as a competitor in this field. As has been stated, both Procter & Gamble and Colgate had introduced low sudsing detergent products. Lever Brothers undertook in 1954 to introduce a low sudsing synthetic detergent. This was a product named "Vim" which was first test-marketed in 1954. It was Lever's intention to gain valuable experience in the growing segment of the

5. The parties disagree as to whether Procter & Gamble's "Pink Dreft Synthetic" is a heavy or light duty detergent. The plaintiff urges that it be classified as a light duty detergent and such classification is accepted by the Court.

detergent industry and to achieve sales for this low sudsing detergent of at least one percent of the entire heavy duty detergent market.

Distribution of "Vim" was accompanied by substantial advertising and mailing of discount coupons to potential customers. Sales rose to one percent in January 1955 but steadily decreased thereafter. In October 1955 sales leveled off at .6 percent. Complaints were received from consumers concerning the tendency of the powdered "Vim" to solidify and form a block when stored on the grocer's shelf. Its sales declined; its losses increased. Losses for the years 1954 and 1955 on this product were respectively $279,000 and $286,000. This caused Lever Brothers, in September 1955, to cancel "Vim's" advertising and to discontinue its distribution early in 1956.

Lever's experience in the detergent market was therefore not successful. It had completely failed in the low sudsing market. It showed losses in the entire heavy duty detergent field. In the fall of 1955 Lever decided it would no longer attempt to increase its sales of heavy duty powdered detergents. Instead it would reduce its advertising and promotion expenses, cancel any plans to introduce new products and try to maintain annual sales of approximately 12 million cases. It was hoped that such economies would result in increased profits. Results for 1956 were mixed. It introduced a liquid synthetic detergent called "Wisk" which unexpectedly lost several million dollars. Lever's other synthetic detergents showed profits for 1956 but case sales for all its heavy duty detergents, excluding "Wisk", slipped from over 12 million cases in 1955 to under 12 million in 1956.

Therefore on December 31, 1956, Lever Brothers had been steadily losing its position in the heavy duty detergent market. It possessed no low sudsing detergent and had abandoned any further attempt to introduce one. None of its high sudsing powdered products possessed more than 4.4 percent of the heavy duty market. Profits on soap products steadily declined and profits on heavy duty powdered detergents in 1956 were the result only of reductions in heavy advertising and promotion expenses.

At that point it was approached by Monsanto with the suggestion that it consider acquiring the product "all". Lever had no low sudsing detergent with which "all" would be competitive. It needed a low sudsing detergent to round out its line of products. It had the experience, expertise and organization to advertise, promote and sell a detergent product, all of which were lacking by Monsanto. Under those circumstances it acquired the product "all" and began to market it.

*Was the Effect of This Acquisition Substantially to Lessen Competition?*

The Government's argument that the effect of this acquisition was substantially to lessen competition is predicated upon the assumption that the relevant market was the entire heavy duty detergent market, ignoring the fact that there was a vigorous and rapidly growing submarket of low sudsing detergents. The Government's position predicates that the heavy duty detergent market was largely concentrated in three firms, Procter & Gamble, Colgate and Lever. It states on page 13 of its brief:

"* * * [I]n 1956 these three firms still had 85% of all heavy-duty detergent sales; Monsanto, as the successor to Detergents, Inc., constituted the only real new entrant to achieve national distribution in heavy duty detergents. By virtue of Lever's asset acquisition, Monsanto ceased to compete with the three leading heavy duty detergent firms; the second leading firm acquired the business of the fourth; its market share rose from 16.8% to 22.4%; and the market share of the leading firms increased from 85% to 90% as a result of this acquisition."

These facts may be considered as true. They overlook, however, the fact, as stated by the Supreme Court in the

Brown Shoe case, that each merger "had to be functionally viewed, in the context of its particular industry." 370 U.S. 294, at pp. 321–322, 82 S.Ct. 1502, at p. 1522. The Supreme Court very wisely pointed out that "[s]tatistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power." But it pointed out further that "only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." 370 U.S. 294, at p. 322, n. 38, 82 S.Ct. at p. 1522.

We have in this case a situation where a very real submarket had developed in low sudsing detergents. This product was chemically different from other heavy duty detergents. It was separately marketed, separately advertised and used for a distinctive purpose. There had been active competition in this submarket. The effect of the competition was that Monsanto had determined to withdraw from the distribution of "all". If it had simply done this the effect would have been undoubtedly to reduce competition in this important submarket. Instead, it transferred the business to Lever Brothers which had previously had a low sudsing detergent which had failed and gone out of business. Lever was in a position to promote actively the sale and distribution of this important product. If this transfer had not been made the entire market in low sudsing detergents would have been concentrated in Procter & Gamble and Colgate. By transferring the product to Lever the product remained available and remained in active competition with the products of Procter & Gamble and Colgate. At the time of the transfer of the asset there were three firms in the market of low sudsing heavy duty detergents: Procter & Gamble, Colgate and Monsanto. After the acquisition there were three firms in the market of low sudsing heavy duty detergents: Procter & Gamble, Colgate and Lever; and by virtue of Lever's experience, ex-pertise and substantial financial position it was in a much better position to compete in this market than Monsanto had ever been.

The detergent and soap industry is a highly competitive industry. Nobody who has sat through the trial of a case such as this—or who has been so unfortunate as to have to listen to night-time television programs—can fail to appreciate the intense competition which exists between the leading firms in this industry. New products are developed and marketed. New advertising programs and marketing programs are initiated. Products rise and products fall as a result of the free play of the competitive system. The very emergence of a higher priced product, such as low sudsing detergents, in this field and the capturing by this higher price product of a substantial part of the market is an indication that competition is not static.

■■ It is to retain such active competition that Section 7 of the Clayton Act was amended in 1950. See the opinion of this Court in American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F. Supp. 387 (1957), aff'd, 2 Cir., 259 F.2d 524 (1958). However, the Clayton Act cannot be made effective by a doctrinaire approach to the problem of competition. It was a realization of this fact that undoubtedly prompted the language of the Supreme Court in the Brown Shoe case. Merely carving out a large segment of an industry as being the relevant line of commerce, without taking into account the competitive realities of submarkets, and merely adding the percentage of the business done by one company to the percentage done by another company does not establish that the effect of the acquisition may be substantially to lessen competition.

We have in this case a situation where an acquisition by one company of the particular brand of another preserved the competitive business of the other company and promoted a more active competition than if the acquisition had not been made. To decide this case by the application of statistical figures, as the

Government would urge the Court to do, would subordinate reality to formulae. It would make the Clayton Act a means of suppressing rather than promoting competition, for it would mean that in the future a company with a failing brand could never transfer that brand to another company ready and able to market and distribute it in true competitive fashion. The brand would die, and competition would be diminished. Certainly such was not the intention of Congress in passing the Act. Congress undoubtedly intended, as the Supreme Court indicated, that the Court should look to the reality of the situation. The reality of the situation in 1956 was that Lever, which had no low sudsing detergent, acquired a low sudsing detergent from a company which was no longer an effective competitor in that submarket. By so doing the brand remained an active brand in a competitive market. The product remained available for the housewife. The acquisition aided, rather than impeded, competition.

Nearly six years have elapsed since the transfer of the "all" trademark to Lever Brothers. This provides the Court with an opportunity to analyze the effects of the transfer on competition within the detergent industry and to determine if substantial anticompetitive results have obtained.

Sales of "all" by Lever Brothers have substantially increased since 1957. Case sales have increased from 4,331,000 cases in 1956 to 6,156,000 cases in 1960. In the same period "all's" market share has increased from 5.5 percent to 6.9 percent.[6] This is a result of vigorous advertising and promotion by Lever Brothers and a chemical improvement of the basic product.[7]

The principal medium of advertising in the detergent industry is the sponsor-ship of television programs. Newspaper advertisements are considerably more expensive in terms of the number of households reached per dollar of advertising expenditure. Monsanto, with only one consumer brand, could not afford the heavy costs of network television sponsorship. Lever Brothers, with many detergent products, has been able to sponsor network television programs by dividing such sponsorship among several of its brands.

Lever Brothers has also succeeded in increasing the number of retail outlets in which "all" is available to consumers. Lever has instituted a cooperative advertising program with local grocery stores under which the stores are paid to feature "all" in local advertisements. Similar payments are made to stores to encourage special "sales" of "all" at reduced prices in an effort to attract new consumers. Monsanto did not have a cooperative advertising program in May, 1957.

When Lever Brothers acquired the "all" trademark in 1957 it was distributing six high sudsing heavy duty detergents. Subsequent to that date Lever has not withdrawn any of its existing brands from the market place and has continued actively to promote and advertise their sale. Profits realized from the sales of "all" have enabled Lever to modify its management decision of 1955 to reduce advertising on its existing brands and to cease from introducing any new products. In 1960 Lever developed and introduced the first low sudsing liquid detergent known as "liquid all". The following year it introduced a low sudsing detergent in pre-measured tablet form known as "Vim Tablets".

There is no evidence to support the position that the acquisition of the "all" trademark by Lever Brothers or its in-

6. Statistics were not provided for either 1961 or 1962.

7. Tests by the market research department of Lever Brothers in 1957 indicated that "all" was inferior to other low sudsing detergents then available to the consumer. Extensive changes were made by Lever that required it to invest over $2 million in new production facilities. The "all" product distributed by Lever in 1963 is significantly different from the detergent produced and sold by Monsanto in 1956.

troduction of new products has given it a dominant place in the detergent industry. The facts are to the contrary. At the end of 1956 Lever's share of the heavy duty market was 16.5 percent. Monsanto's sales of "all" were 5.5 percent of that market so that the combined share of the market was 22.0 percent. In 1960, excluding sales of "all", Lever's share of the heavy duty detergent market had declined to 14.2 percent. Sales of "all" increased to 6.9 percent of the market so that Lever's entire share has been reduced to 21.1 percent.

The decline in Lever's share of the market has resulted in a higher share of the market for the numerous small distributors of detergents. The following table shows the market shares of the three large distributors of detergents and a common grouping for small distributors for the years 1956 and 1960:

### Company Shares of the Heavy Duty Detergent Market [8]

| Company | 1956 | 1960 |
|---|---|---|
| Procter & Gamble | 56.7% | 56.1% |
| Lever Brothers | 16.5 | 21.1   (combined) |
| Monsanto | 5.5 | — |
| Colgate | 11.6 | 11.2 |
| All others | 9.7 | 11.6 |

The chart indicates that the market share enjoyed by Procter & Gamble has decreased slightly. At the same time the market share of the small distributors has increased by almost 20 percent. The higher share of the market for small distributors is evidence that competition in the heavy duty detergent industry has increased in vigor since 1957 and does much to refute the contention that competition has been or may in the future be lessened substantially because of the transfer.

It must be remembered that this is not a situation in which Monsanto agreed to eliminate the manufacture of "all". It was a case where Monsanto simply agreed, in effect, to withdraw from the marketing of the product under that name. It still retained the right to manufacture the product and sell it to other companies for their use under some other trade name. The facts show that Monsanto has continued to produce the product and has sold it to other companies for distribution under their trademarks. These companies are Climalene Co., which distributes the product under the trademark "Spin", Armour & Co., which distributes it under the trademark "Triumph", and Swift & Co., which distributes it under the trademark "Solar". The transfer of the trademark "all" did not eliminate the product from the market; that product is distributed by Lever Brothers and also by the other small companies which acquire the product from Monsanto and distribute it under their own trademarks.

Confining the market to low sudsing detergents, "all's" share of that market has declined in spite of Lever's heavy expenditures for advertising and promotion. At the end of 1956 "all" accounted for 55.3 percent of the sales of low sudsing detergents. Six years later "all's" share of the market had declined to an estimated 35.7 percent. Combining the sales of Lever's three low sudsing detergents, "all", "liquid all" and "Vim Tablets", for the year 1962 shows that Lever's entire share of the market was 44.2 percent or considerably less than the 55.3 percent enjoyed by Monsanto in 1956.

Increased sales and efficient distribution have enabled Lever to distribute "all" profitably. Earnings for the pe-

8. See Lever Exhibit 226.

riod 1957 to 1960 were $23.6 million. In addition, "all" was able to absorb $11.5 million of general overhead expense that would have been charged to other brands in the absence of "all". It is these profits which have enabled Lever to increase the advertising and promotional support of its existing brands and to undertake the heavy expenditures required for the introduction of two new brands. This is to the benefit of the consumer who may choose today among more and better detergents than were available in 1957.

### Conclusion

The determination as to whether the transfer of an asset may substantially lessen competition is something which cannot be determined merely by bare statistics. As Judge Herlands put it in United States v. Columbia Pictures Corp., 189 F.Supp. 153, 196 (S.D.N.Y. 1960):

> "Statistics dealing with only rank and percentages do not by themselves suffice to describe whether the vigor of competition has been affected."

The Senate Committee on Antitrust and Monopoly made the same point in these words:

> "Bare statistics necessarily omit many qualitative factors which are essential to a complete understanding of the competitive structure of the entire industrial economy or of an individual industry." Concentration in American Industry, 85th Cong., 1st Sess., p. 4 (1957).

Or, as Judge Bryan said in his recent opinion in United States v. Continental Can Co., 217 F.Supp. 761 (S.D.N.Y. 1963):

> " * * * Mere mechanical or quantitative application of § 7 should be avoided and each case must be judged in the light of its own peculiar facts. Only within such a setting can the probable anti-competitive effects of a merger be judged."

The Court has weighed the evidence in the record as a whole. After doing so the Court concludes that the proof submitted established a relevant market of heavy duty detergents and a relevant submarket of low sudsing heavy duty detergents.

The Court concludes that the evidence failed to establish that in either of these lines of commerce was there any reasonable probability of substantial anticompetitive effects or a tendency to monopoly as a result of the transfer of the assets herein involved. The acquisition was not shown to be of the type proscribed by Section 7 of the Clayton Act. Judgment shall be entered for the defendants dismissing the complaint.

This opinion constitutes my findings of fact and conclusions of law in this case pursuant to Rule 52(a) of the Rules of Civil Procedure.

It is so ordered.